# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | | |
|---|---|---|
| LUIS LIMON, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-07-0274 |
| | § | |
| BERRYCO BARGE LINES, L.L.C., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

In this admiralty case, one of the defendants, Garber Brothers, Inc., seeks summary judgment dismissing the claims asserted against it by the plaintiffs, Luis Limon, Manuel Olivarez, Jr., and Porfirio Montalvo, and by the third-party plaintiff, Berryco Barge Lines, L.L.C.[1] The plaintiffs and Berryco allege that Garber Brothers was negligent in not placing required navigational lights on the barge that was struck by Berryco's work boat on which the plaintiffs were passengers. (Docket Entry No. 110). Garber Brothers moved for summary judgment on two grounds: (1) it bareboat chartered the barge to a third party, which is liable for any casualties resulting from the barge's operation; and (2) it did not operate a tugboat that moored the barge and would be responsible for lighting the barge. (Docket Entry No. 130). In response to Berryco's argument that Inland Barge Rentals, Inc., the barge owner, did not bareboat charter the barge to Garber Brothers in the first place, Garber Brothers argues that if that is correct, Inland Barge—not Garber Brothers—would bear any liability for injuries arising from the barge's operation. (Docket Entry No. 135).

---

[1] Garber Brothers's summary judgment motion is filed as Docket Entry No. 130. Berryco responded, (Docket Entry No. 133), and Limon, Olivarez, and Montalvo adopted and incorporated Berryco's response, (Docket Entry No. 134). Garber Brothers replied. (Docket Entry No. 135).

Based on the motion, response, and reply; the evidence in the record; and the applicable law, this court denies Garber Brothers's motion for summary judgment. The reasons are explained below.

I.  **Background**

On January 9, 2007, Limon, Olivarez, and Montalvo, employees of defendant Unit Texas Drilling, were on a work boat, the M/V NIKKI D, owned by Berryco. The work boat was traveling to a drilling rig in Sabine Lake owned by Kaiser-Francis Oil Company. While traveling to the rig, the M/V NIKKI D, piloted by Captain Steve Turrentine, struck an unlit barge. The M/V NIKKI D bounced off the barge and struck an unmanned manifold platform owned by SL Production Company, L.L.C. and maintained by Kaiser-Francis. (Docket Entry No. 142 at 1–2).

Garber Brothers asserts that it did not own a tugboat or barge that was in Sabine Lake in January 2007. (Docket Entry No. 130-2, Ex. B, Totten Depo. at 78). The only barge in the area associated with Garber Brothers was "dumb" barge OB-819, owned by defendant Inland Barge and under charter or lease to Garber Brothers.[2] (Docket Entry No. 130 at 3). Garber Brothers questions whether barge OB-819 had any involvement in the incident but maintains that its summary judgment motion does not depend on resolving this issue. (Docket Entry No. 135 at 2). For the purposes of deciding this motion, this court assumes without deciding that barge OB-819 was the barge involved in the allision.

The summary judgment evidence is that in November 2005, Inland Barge "rented" barge OB-819 to Garber Brothers through an oral agreement. Inland Barge states that the barge was simply "rented" to Garber Brothers. (Docket Entry No. 115 at 2). There was no period specified

---

[2] A "dumb" barge lacks power or crew.

for Garber Brothers's use of the barge. (Docket Entry No. 130-1, Ex. A, Carline Depo. at 10). Ronnie Totten, Garber Brothers's General Manager, was questioned in his deposition about this arrangement. When asked whether Garber Brothers controlled "the whole barge with no limitations whatsoever," Totten responded, "[n]ot necessarily." (Docket Entry No. 130-2, Ex. B, Totten Depo. at 15–16). Totten clarified that there were likely some restrictions on the vessel's weight and its use in "rough waters." (*Id*. at 16). Inland Barge insured barge OB-819. (Docket Entry No. 133-5, Ex. E at 36–37). Although Garber Brothers did not insure the barge, (Docket Entry No. 130-2, Ex. B, Totten Depo. at 72–74), it did conduct on-hire and off-hire surveys. (*Id*. at 19). Inland Barge maintains that at the time of the incident, it neither operated nor controlled barge OB-819. (Docket Entry No. 140 at 5).

Beginning in December 2006, Garber Brothers chartered barge OB-819 to Brammer Engineering. (Docket Entry No. 130-5, Ex. E). Garber Brothers asserts that because Brammer Engineering bareboat chartered the vessel, Garber Brothers cannot as a matter of law be liable for any injuries that might have arisen from the vessel's operation and owed no duty to anyone injured as a result of the vessel's operation. (Docket Entry No. 130). Totten negotiated the agreement over the telephone with Mark Barton, an operations engineer for Brammer Engineering. (Docket Entry No. 135-1, Ex. 1). The charter invoice states that Garber Brothers charged Brammer Engineering "[f]or the services of the barge OB-819 to be used as directed with drilling operations." (Docket Entry No. 130-5, Ex. E). Totten testified that, under this agreement, Brammer Engineering was free to use barge OB-819 in any fashion it wanted "as long as it ha[d] to do with . . . this particular well and Brammer Engineering." (Docket Entry No. 130-2, Ex. B, Totten Depo. at 18). When asked whether Brammer Engineering could use the barge outside those limits, Totten said that he would

3

expect Brammer Engineering to call him and discuss whether changes in the agreement would be permitted. (*Id*. at 30). Totten stated that a price negotiation would be necessary before any changes occurred. (*Id*.).

During the period Brammer Engineering was using barge OB-819, Garber Brothers was asked by Kaiser-Francis and Brammer Engineering to repair a compressor on the barge. (Docket Entry No. 135 at 2, Docket Entry No. 130-2, Ex. B, Totten Depo. at 22). Garber Brothers owned that compressor and had previously placed it on the barge. (Docket Entry No. 135 at 2).

Garber Brothers argues that if, under the Inland Navigation Rules or other statutory or regulatory requirements, the barge should have been lit, it was the responsibility of the tug company that moored the barge to light it. (*Id*. at 6). Garber Brothers asserts that its usual practice, consistent with industry custom, is to charter a barge without placing lights on it. Totten testified that Garber Brothers followed its usual practice when it charted barge OB-819 to Brammer Engineering without placing lights on it. (Docket Entry No. 133-2, Ex. B, Totten Depo. at 14–15). Totten stated that the only instance in which Garber Brothers furnishes lights to a barge charterer is when the charterer believes the barge will be a navigational hazard. (*Id*. at 69). Double Eagle's managing member, (Docket Entry No. 130-4, Ex. D, Porciau Depo. at 114), and Samuel Romero, a tugboat captain of twenty-two years, (Docket Entry No. 130-3, Ex. C, Romero Depo. at 84), both testified that the last tugboat captain to moor the barge is responsible for lighting the barge. Inland Barge's president, Byron Carline, testified that although he had "no experience on tugboats," it was his opinion that the tug company is responsible for putting lights on the barge. (Docket Entry No. 130-1, Ex. A, Carline Depo. at 55). Garber Brothers alleges that this evidence collectively shows the industry custom. (Docket Entry No. 130 at 8).

Garber Brothers argues that as a matter of law, it is not liable for the injuries or the collision because it bareboat chartered the barge OB-819 to Brammer Engineering and because it did not operate the tugboat that moored the barge. According to Garber Brothers, it had no duty to light the barge and is not otherwise responsible for any injuries arising from the barge's operation. (*Id.* at 1). Berryco responds that there is a genuine fact issue material to determining whether Garber Brothers bareboat chartered barge OB-819 to Brammer Engineering, arguing that the evidence shows that Garber Brothers exerted control over the barge inconsistent with a bareboat charter arrangement. (Docket Entry No. 133). Berryco alternatively argues that Garber Brothers did not have the right to bareboat charter the barge to Brammer Engineering because Inland Barge had not bareboat chartered the barge to Garber Brothers. (*Id.* at 5–6). In response, Garber Brothers contends that if it had no right to bareboat charter barge OB-819 to Brammer Engineering, Inland Barge, as the barge owner, would be liable for any damages owed to the plaintiffs and Berryco. (Docket Entry No. 135 at 4–5). Berryco finally contends that even though Garber Brothers did not moor the barge that caused the plaintiffs' alleged injuries, "Garber Brothers cannot ignore the safety and unseaworthy conditions of a barge that it chartered." (Docket Entry No. 133 at 6).

Each issue is analyzed below.

## II. The Applicable Legal Standards

### A. The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes XX, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See id.* The nonmovant must do more than show that there is "some metaphysical doubt as to the material facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Id.* at 255; *Marathon E.G. Holding Ltd. v. CMS Enters. Co.*, 597 F.3d 311, 316 (5th Cir. 2010)**.**

### B.     **Maritime Negligence**

The elements of a maritime negligence cause of action are essentially the same as negligence under the common law. *See Withhart v. Otto Candies, L.L.C.,* 431 F.3d 840, 842 (5th Cir. 2005)

(citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S. Ct. 406, 409 (1959)); *Canal Barge Co., Inc v. Torco Oil Co.*, 220 F.3d 370, 376–77 (5th Cir. 2000). To prevail on a negligence claim, a plaintiff must establish three elements: "(1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach," with duty as the threshold inquiry. *Ford v. Cimarron Ins. Co., Inc*., 230 F.3d 828, 830 (5th Cir. 2000) (citing *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990)). The critical issue is whether Garber Brothers owed a legal duty to the plaintiffs or to Berryco.

### C. Charter Agreements

"A 'charter' is an arrangement whereby one person (the 'charterer') becomes entitled to the use of the whole of a vessel belonging to another (the 'owner')." *Walker v. Braus*, 995 F.2d 77, 80 (5th Cir. 1993). There are three principal forms of charter agreements: the time charter, the voyage charter, and the bareboat charter. 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 11-1 (4th ed. Westlaw 2010). Time charters and voyage charters are non-demise charters; bareboat charters are demise charters. "The distinction between the demise and non-demise charters depends on the degree of control retained by the owner of the vessel." *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993).

Under a time charter, the owner retains possession and control of the vessel. The owner also provides the crew, remains responsible for operating expenses, and makes repairs as needed. *Walker*, 995 F.2d at 81. *But see In re Mobro Marine, Inc.*, No. 3:02-CV-471-J-20-TEM, 2004 WL 3222743, at *2–3 (M.D. Fla. Dec. 20, 2004) (court held that a bareboat charter agreement existed despite the fact that the owner of the vessel made repairs to it when requested by the charterer). A voyage charter is similar to a time charter but exists only when the charterer rents the vessel for a

7

single voyage. 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 11-1 (4th ed. Westlaw 2010). Time charterers and voyage charterers, as non-demise charterers, are "not liable for claims of negligence of the crew or for the unseaworthiness of the vessel." *Forrester*, 11 F.3d at 1215. The owner of the vessel remains liable for these claims.

"If a shield [from liability] is possible, it can be provided only by a valid bareboat charter." *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 182 (5th Cir. 1981). Under a bareboat charter, "[t]he vessel owner transfers full possession and control to the charterer, who in turn furnishes the crew and maintenance for the vessel (thus the term 'bareboat')." *Forrester*, 11 F.3d at 1215. A bareboat charter is "tantamount to, though just short of, an outright transfer of ownership." *Agrico Chem. Co. v. M/V Ben W. Martin*, 664 F.2d 85, 91 (5th Cir. 1981) (quoting *Guzman v. Pichirilo*, 369 U.S. 698, 700, 82 S. Ct. 1095, 1096 (1962)). A bareboat charter agreement need not be in writing. *Agrico Chem. Co.*, 664 F.2d at 91. A bareboat charterer is an owner *pro hac vice* and "has unrestricted use of the vessel." *Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc.*, 830 F.2d 1332, 1342 n.11 (5th Cir. 1987) (citing *Trussell v. Litton Sys., Inc.*, 753 F.2d 366, 368 (5th Cir.1984)). As a result, the bareboat charterer becomes responsible for any negligence of the crew and unseaworthiness of the vessel. *Forrester*, 11 F.3d at 1215.

Bareboat charter agreements typically contain provisions addressing delivery of the vessel, redelivery at the end of the term, subchartering, restrictions on use, salvage, and responsibility to make repairs, purchase insurance, and indemnification. 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 11-3 (4th ed. Westlaw 2010). The bareboat charterer typically is required to carry vessel insurance, indemnity insurance, and crew insurance. *Agrico Chem. Co.*, 664 F.2d at 92. "Though not essential, a survey of the vessel on delivery and redelivery is customary to

determine the condition of the vessel at the beginning of the [bareboat] charter and its condition at the end, so as to fix responsibility for and limit disputes about damage during the charter." *Id*.

Agreements for the use of a barge are typically bareboat charters, as barges lack power and often have no crew. *Id*. at 91. But an owner may charter a barge and provide a tow, in which case the owner remains in control of the barge. *Id*. "The burden placed on the party seeking to establish a demise charter 'is heavy, for courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship.'" *Martin v. Walk, Haydel & Assocs.,* Inc., 742 F.2d 246, 248–49 (5th Cir. 1984) (citing *Guzman*, 369 U.S. at 699, 82 S. Ct. at 1096)

A bareboat charterer may charter a vessel from its original owner and then bareboat charter that vessel to another party. *See e.g. Bosnor S.A. de C.V. v. Tug L.A. Barrios*, No. H-81-2460, 1984 WL 1428, at *4–5 (S.D. Tex. Oct. 1, 1984). However, neither a time charterer nor a voyage charterer can bareboat charter its vessel to another party. A bareboat charter requires the transfer of full possession and control of the vessel to the charterer. *Walker*, 995 F.2d at 81. Neither a time charterer nor a voyage charterer has full possession and control of the vessel that it is chartering and therefore cannot bareboat charter that vessel to another.

### D.     The Warranty of Seaworthiness

The owner of the chartered vessel has an obligation to provide a seaworthy vessel. The warranty of seaworthiness is implied in a bareboat charter agreement. 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 11-3 (4th ed. Westlaw 2010). To state a cause of action for unseaworthiness, a plaintiff must allege his injury was caused by a defective condition of the ship or its equipment. 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6-25 (4th ed. Westlaw 2010). The duty of seaworthiness is absolute. *Id*. "Unseaworthiness . . . can be the *per*

9

*se* result of a regulatory violation." *Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 162 (5th Cir. 1985) (citing *Phipps v. S.S. Santa Maria*, 418 F.2d 615, 616–17 (5th Cir. 1969)). The standard for an unseaworthiness claim is "proximate cause in the traditional sense." *Smith*, 772 F.2d at 162 (citing *Comeaux v. T.L. James & Co., Inc.*, 702 F.2d 1023, 1024 (5th Cir. 1983)). "Proximate cause means that (1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Smith*, 772 F.2d at 162 (citing *Alverez v. J. Ray McDermott & Co., Inc.*, 674 F.2d 1037, 1042–43 (5th Cir. 1982).

A bareboat charter does not necessarily free a vessel's owner from liability. *Baker*, 656 F.2d 173. In *Baker*, the court determined that no valid bareboat charter existed but "that even such a charter would not have released it from its liability as owner for the unseaworthiness of its vessel." *Id.* at 182. The court pointed out that the lower courts have generally agreed that the owner of a vessel, even after it bareboat chartered a vessel, "still remains liable for injuries caused by defects in the vessel that existed before the commencement of the charter." *Id*. (citing *Nat G. Harrison Overseas Corp. v. Am. Tug Titan*, 516 F.2d 89, 96 (5th Cir.), *modified per curiam*, 520 F.2d 1104 (1975); *Hamilton v. Canal Barge Co., Inc.*, 395 F. Supp. 978, 988 (E.D. La. 1975); *Solet v. M/V Capt. H.V. Dufrene*, 303 F. Supp. 980, 984 (E.D. La. 1969)). "[A] seaman may have recourse in personam against the owner of an unseaworthy vessel, without regard to whether owner or bareboat charterer is responsible for the vessel's condition." *Baker*, 656 F.2d at 184. "The allocation of ultimate liability should be the responsibility of the owner and charterer, who 'can sort out which between them will bear the final cost of recovery'" through indemnity or contribution. *Id*. (citing *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 225 (5th Cir. 1975)). In *Farnsworth v. Basin Marine, Inc.*,

the court held that "the appropriate defendant in an unseaworthiness case is the person who had operational control of the ship at the time the condition was created or the accident occurred." No. Civ. A. 97-3091, 1998 WL 259972, at *1 (E.D. La. May 20, 1998).

Under 33 C.F.R. § 162.75(b)(3)(iii), "[l]ights shall be displayed in accordance with provisions of the Navigation Rules." The parties do not identify the specific provisions of the Navigation Rules that applied to barge OB-819. In *Horton & Horton, Inc. v. The S/S Robert E. Hopkins*, the court ruled that an improper display of lights constituted statutory fault on the part of the barge. 269 F.2d 914, 917–18 (5th Cir. 1959). It held both the tug and the barge towed by the tug liable for these statutory violations. *Id*. at 918. In that case, unlike the present case, the tug and the barge were owned by the same entity. *Id*. at 916. The court in *In re Mobro Marine, Inc*. held that a barge operator was responsible for lighting the barge that it had moored under a bridge, noting that "[l]ighting of barges is one of those ordinary practices that is expected of barge operators." No. 3:02-CV-471-J-20-TEM, 2004 WL 3222743, at *5. The court found a valid bareboat charter agreement between Mobro, the barge owner, and Superior, the charterer, and held Superior liable despite the fact that Mobro had bareboat chartered the barge to Superior "without any permanent or fixed navigational or mooring lights." *Id*. at *2.

## III.    Analysis

### A.    The Charter Agreement between Inland Barge and Garber Brothers

Berryco asserts that there is a fact issue as to whether Inland Barge bareboat chartered barge OB-819 to Garber Brothers. If this agreement was not a bareboat charter, then Garber Brothers could not have bareboat chartered the barge to Brammer Engineering. (Docket Entry No. 133 at 5–6). The record evidence is insufficient to determine, as a matter of law, the precise nature of the

11

charter agreement between Inland Barge and Garber Brothers for barge OB-819. Inland Barge maintains that at the time of the allision, it was not operating or controlling the barge. (Docket Entry No. 140 at 5). In its answer to the third-party complaint, Inland Barge stated that the barge was "rented" to Garber Brothers. (Docket Entry No. 115 at 2). But the summary judgment record does not establish the terms of the "rental" sufficiently to show whether, as a matter of law, it was or was not a bareboat charter. The facts that Garber Brothers did not insure the barge and did conduct surveys are not sufficient; a bareboat charterer is not always required to insure its vessels, *Agrico Chem. Co.*, 664 F.2d at 92, and while bareboat charterers often conduct surveys, they are "not essential" to such a charter. *Id.*

Berryco emphasizes that when Totten was asked whether Inland Barge rented the barge to Garber Brothers "with no limitations whatsoever," Totten responded "[n]ot necessarily." (Docket Entry No. 133-2, Ex. B, Totten Depo. at 15–16). Berryco's argument is that if the charter had been bareboat, Garber Brothers, as owner *pro hac vice*, would have "unrestricted use of the vessel" and no limitations. *Kerr-McGee Corp.*, 830 F.2d at 1342 n.11. However, bareboat charter agreements may contain some restrictions-on-use provisions. Such restrictions "do not weigh against a finding of a demise charter, because such provisions are typical in [bareboat charter] agreements." *Wills v. One Off, Inc.*, Civ. No. 08-11086-JLT, 2010 WL 1427502, at *5 (D. Mass. Apr. 8, 2010) (citing 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 11-3 (4th ed. 2004)). The restrictions that Totten referred to—limits on weight and on use in "rough waters," (Docket Entry No. 130-2, Ex. B, Totten Depo. at 15–16)—do not necessarily defeat bareboat charter status because they are not inconsistent with possession and control. "[C]ontracts for the mere use of a barge are usually bareboat," but there is not enough evidence in the record to make a determination as to the

type of charter agreement between Inland Barge and Garber Brothers. *Agrico Chem. Co.*, 664 F.2d at 91.

## B. The Agreement Between Garber Brothers and Brammer Engineering

If Inland Barge did bareboat charter the barge to Garber Brothers, the next issue is the nature of the agreement between Garber Brothers and Brammer Engineering. The record shows that Garber Brothers did enter into a bareboat charter agreement with Brammer Engineering. *See Guzman*, 369 U.S. at 699, 82 S. Ct. at 1096.[3] Brammer Engineering could use barge OB-810 any way it wanted "as long as it ha[d] to do with . . . this particular well and Brammer Engineering." (Docket Entry No. 130-2, Ex. B, Totten Depo. at 18). The invoice for the charter was equally broad, stating that Garber Brothers charged Brammer Engineering "[f]or the services of the barge OB-819 to be used as directed with drilling operations." (Docket Entry No. 130-5, Ex. E). Such a restriction does not defeat a bareboat charter. *See Wills*, Civ. No. 08-11086-JLT, 2010 WL 1427502, at *5 (citing 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 11-3 (4th ed. 2004)). Garber Brothers was open to the possibility of expanding the scope of the agreement but wanted a price readjustment if this were to happen. (Docket Entry No. 130-2, Ex. B, Totten Depo. at 30).

The fact that Garber Brothers was asked to repair a compressor on the barge does not preclude the existence of a bareboat charter agreement. Repairing the vessel is typically a responsibility of the vessel owner under a time charter or voyage charter agreement. *Walker*, 995

---

[3] Berryco relies on testimony from Craig Grieve, a petroleum engineer for Brammer Engineering, that the agreement was a time charter and Brammer Engineering did not assume any liability for the seaworthiness of the vessels used to support its drilling operations. (Docket Entry No. 133 at 4–5). However, the testimony to which Berryco refers addresses the general procedure Brammer Engineering used for chartering barges. Grieve did not specifically address the barge OB-819 charter agreement. (Docket Entry No. 133-4, Ex. D, Grieve Depo. at 58–62). Grieve was not involved in the negotiations for the agreement. (Docket Entry No. 135-1, Ex. 1). Totten negotiated the agreement with Mark Barton with Brammer Engineering, not Grieve. *Id.*

F.2d at 81. The fact that a vessel owner repairs the vessel is not necessarily inconsistent with a bareboat charter agreement. One court has held that a bareboat charter agreement existed despite the fact that the vessel owner made repairs on the charterer's request. *In re Mobro Marine, Inc.*, No. 3:02-CV-471-J-20-TEM, 2004 WL 3222743. Moreover, the evidence in the record is that Garber Brothers owned the compressor and had placed it on the barge. As Garber Brothers argues, "[r]epairing a piece of equipment aboard the [b]arge that is not a part of the [b]arge is remarkably different than making repairs to the [b]arge itself." (Docket Entry No. 135 at 2). Kaiser-Francis and Brammer Engineering called on Garber Brothers to repair the compressor; Garber Brothers did not make the repair as a matter of routine maintenance or after coming onto the vessel to inspect it and make any needed repairs. (Docket Entry No. 133-2, Ex. B, Totten Depo. at 22). Garber Brothers's repair of the compressor did not deprive Brammer Engineering of the full possession and control of the barge and is not inconsistent with the bareboat nature of the charter.

The record shows that as a matter of law, Garber Brothers had a bareboat charter arrangement with Brammer Engineering, if Garber Brothers had bareboat chartered the barge from Inland Barge.

### C. Unseaworthiness

Berryco contends that even if Inland Barge bareboat chartered the barge to Garber Brothers and Garber Brothers bareboat chartered the barge to Brammer Engineering, Garber Brothers would still be liable for the unseaworthiness of the barge. Under the case law, Garber Brothers, as the *pro hac vice* owner of the barge, may still be liable for injuries caused by its unseaworthy condition if that condition existed before the charter began. *See Nat G. Harrison Overseas Corp.*, 516 F.2d at 96; *Hamilton*, 395 F. Supp. at 988; *Solet*, 303 F. Supp. at 984; *Farnsworth*, No. Civ. A. 97-3091,

1998 WL 259972, at *1 ("[T]he appropriate defendant . . . is the person who had operational control of the ship at the time the condition was created or the accident occurred.") .

Garber Brothers acknowledges that at the time of the allision, the barge was subject to the Inland Navigation Rules (or other statutory requirements) relating to lights. (Docket Entry No. 135 at 6). The parties appear to accept—at least for the purpose of this summary judgment motion—that the lack of proper lighting on the barge was a proximate cause of the allision, "play[ing] a substantial part in bringing about or actually causing the injury." *Id*. If the absence of lights was a defect that made the barge unseaworthy, the relevant inquiry is whether that unseaworthy condition was present before Brammer Engineering chartered the vessel. None of the parties has pointed to the specific Inland Navigation Rules that require a barge like the OB-819 to be lit. It is unclear from the record when such a barge must be equipped with lights. Totten testified that typically Garber Brothers does not install lights or give lights to the charterer when the barge is bareboat chartered. (Docket Entry No. 130-2, Ex. B, Totten Depo. at 69). Totten testified that Garber Brothers only provides lights when its charterer believes the barge will become a navigational hazard. (*Id*.). Without more specific information as to when the applicable rules required the barge to be lit, there is an inadequate record to determine whether, if the absence of lights was a defect that constituted unseaworthiness, that defect was present before the charter began.

Garber Brothers argues that "[c]ase law and industry custom provide that the last tugboat operator to moor a barge is responsible for *lighting* the barge." (Docket Entry No. 130 at 7) (emphasis added). Berryco cites *Horton & Horton, Inc.* to support its argument that Garber Brothers should be at fault for the barge's improper lighting even if it did not tow the barge. In that case, the court held that both the tug and the barge towed by the tug were liable for the barge's improper

15

display of lights. 269 F.2d at 917–18. In *Horton & Horton, Inc.*, however, the same entity owned the tug and the barge, while in the present case, the tug and the barge were owned by separate entities. It is unclear from the record whether or when the industry custom as well as the rules imposed on the tug owner or operator the responsibility to install lights on the barge as opposed to ensuring that the lights were used as appropriate. Inland Barge's president testified that the tug company is responsible for *putting* the lights on the barge. (Docket Entry No. 130-1, Ex. A, Carline Depo. at 55) (emphasis added). Totten similarly testified that it is the responsibility of the tugboat operator to *put* lights on the barge. (Docket Entry No. 130-2, Ex. B, Totten Depo. at 71) (emphasis added). Double Eagle's managing member and Samuel Romero, a tugboat captain of twenty-two years, both stated that the last tugboat operator is responsible for *lighting* the barge but did not explain whether that meant installing the lights in the first place. (Docket Entry No. 130-4, Ex. D, Porciau Depo. at 114, Docket Entry No. 130-3, Ex. C, Romero Depo. at 84). Given these gaps in the record, there is an inadequate basis to find, as a matter of law, that Garber Brothers could or could not be liable for the absence of lights on the barge OB-819 when the incident occurred.

## IV. Conclusion

Garber Brothers's motion for summary judgment is denied.

SIGNED on August 5, 2010, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

16